P7963351

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

## PRESENTENCE INVESTIGATION REPORT

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | **Docket No.: 0208 1: S5 21 CR 133-06(VM)** |
| ) | |
| **vs.** ) | |
| ) | |
| ) | |
| **Adalid  Cabrera Huato** ) | **Sentence Date: 06/23/2023** |
| ) | |

**Prepared for:**      Honorable Victor  Marrero
                              Senior U.S. District Judge

**Prepared by:**       Robert  Flemen
                              USPO
                              212-805-5125
                              Robert_Flemen@nysp.uscourts.gov

**Assistant U.S. Attorney**                    **Defense Counsel**
Michael R. Herman                               Bernard A. Seidler, Esq.
DOJ-USAO                                              B. Alan Seidler
1 St. Andrew's Plaza                              305 Broadway
New York, NY 10007                             Ste 7th Floor
212-637-2221                                         New York, NY 10007
michael.herman@usdoj.gov                   212-334-3131
                                                            snedens66@aol.com

**Offense:**          <u>Count 1</u>:
                           Conspiracy to Distribute and Possess With the Intent to Distribute
                           Methamphetamine
                           21 U.S.C. § 846, 21 U.S.C. §841(b)(1)(A)
                           At least 10 years, up to life imprisonment/a mandatory minimum term of
                           five years' supervised release, up to life/a maximum fine of
                           $10,000,000/$100 special assessment
                           (Class A Felony)

**Release Status:**      Arrested on April 20, 2022, and remanded.

**Detainers:**            None.

**Codefendants:**      See Part A

**Related Cases:**      None.

**Date Report Prepared: May 17, 2023**                     **Date Report Revised:**



## Identifying Data:

| | |
|---|---|
| **Date of Birth:** | November 26, 1997 |
| **Age:** | 25 |
| **Race:** | Unknown |
| **Hispanic Origin:** | Hispanic origin |
| **Sex:** | Male |
| | |
| **SSN#:** | None. |
| **FBI#:** | 7NMXH906C |
| **USM#:** | 96956-509 |
| **State ID#:** | None. |
| **Alternate IDs:** | None. |
| **ICE#:** | A206690136 |
| | |
| **Education:** | High School |
| **Dependents:** | 0 |
| **Citizenship:** | Mexico |
| **Immigration Status:** | Illegal Alien |
| | |
| **Address:** | Undomiciled |
| | |
| **Alias(es):** | None. |

*Restrictions on Use and Redisclosure of Presentence Investigation Report.* Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

Cabrera Huato, Adalid                    3                    P7963351 - Flemen, Robert

## PART A. THE OFFENSE

### Charges(s) and Conviction(s)

1.   Superseding Indictment S5 21 CR 133(VM) was filed in the Southern District of New York.

2.   <u>Count 1</u> charges that from at least March 2020 through November 2020, in the Southern District of New York and elsewhere, FRANCISCO JAVIER MECINA BARRERA, a/k/a "Angel," **ADALID CABRERA HUATO, a/k/a "China," a/k/a "Arana,"** and others conspired to distribute and possess with intent to distribute 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, in violation of 21 USC 841(b)(1)(A).

(21 USC 846)

3.   <u>Count 2</u> charges that from at least March 2020 through November 2020, in the Southern District of New York and elsewhere, MECINA BARRERA, **ADALID CABRERA HUATO,** and others conspired to import into the United States and into the customs territory of the United States from a place outside thereof, and manufacture and distribute, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States from a place outside thereof, 500 grams and more of mixtures or substances containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomer, in violation 21 USC 959(a),  960(a)(3), and 961(b)(1)(H).

(21 USC 963)

4.   <u>Count 3</u> charges that in October 2020, in the Southern District of New York and elsewhere, MECINA BARRERA and **ADALID CABRERA HUATO,** during and in relation to the narcotics trafficking conspiracy charged in <u>Count 1</u> and the narcotics importation conspiracy charged in <u>Count 2</u>, knowingly did use and carry a firearm, and, in furtherance of such crime, did possess and brandish a firearm, and did aid and abet the same.

(18 USC 924(c)(1)(A)(i) and (ii))

5.   <u>Forfeiture Allegation</u>: As a result of committing the offenses alleged in <u>Counts 1 and 2</u> of this Indictment, MECINA BARRERA and **ADALID CABRERA HUATO** shall forfeit to the United States, pursuant to 21 USC 853, any and all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of said offense and any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, said offenses, including but limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

Cabrera Huato, Adalid                     4                    P7963351 - Flemen, Robert

6.    As a result of committing the offense alleged in Count 3, MECINA BARRERA and
      **CABRERA HUATO**, shall forfeit to the United States, pursuant to Title 18, United States
      Code, Section 924(d)(1) and Title 28 United States Code, Section 2461(c), any and all
      firearms and ammunition involved in or used in said offense, including but not limited to:

      A Spike's Tactical model ST-15 firearm bearing serial number DTOM01262; and

      A forty-five round drum magazine loaded with thirty-seven rounds of 5.56 ammunition.

                                    (21 USC 853)

7.    On March 22, 2023, the defendant appeared before the Honorable Sarah Netburn and
      allocuted to the criminal conduct charged in Count 1 only, in accordance with a written
      plea agreement, dated March 1, 2023. Sentencing is scheduled for June 23, 2023, before
      the Honorable Victor Marrero.

8.    In exchange for the defendant's guilty plea, the parties have stipulated to the following
      information:

      a. The November 1, 2021, edition of the Guidelines Manual is applicable in this case.

      b. The Sentencing Guideline applicable to the offense charged in Count One of the
      Indictment is §2D1.1. Pursuant to §§2D1.l(a)(5) and 2D1.l (c)(1), the base offense level is
      38 because the offense involved at least 45 kilograms or more of methamphetamine.

      c. Pursuant to §2D1.l(b)(1), two levels are added because a firearm was possessed.

      d. Pursuant to §2D1.l (b)(2), two levels are added because the defendant used violence ,
      made a credible threat to use violence, or directed the use of violence.

      e. Pursuant to §2D1.l (b)(5), two levels are added because the offense involved the
      importation of methamphetamine, and the defendant is not subject to a mitigating role
      adjustment under §3B1.2.

      f. Pursuant to §3B l. l (a), four levels are added because the defendant was an organizer or
      leader of criminal activity that involved five or more participants or was otherwise
      extensive.

      g. Assuming the defendant clearly demonstrates acceptance of responsibility, to the
      satisfaction of the Government, through his allocution and subsequent conduct prior to the
      imposition of sentence, a two-level reduction will be warranted, pursuant to §3E1. l (a).
      Furthermore, assuming the defendant has accepted responsibility as described in the
      previous sentence, the Government will move at sentencing for an additional one-level
      reduction, pursuant to §3E1.l(b), because the defendant gave timely notice of his intention
      to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and
      permitting the Court to allocate its resources efficiently.

Cabrera Huato, Adalid                    5                    P7963351 - Flemen, Robert

h. In accordance with the above, the applicable Guideline offense level would be 45; however, pursuant to Application Note 2 of Part 5A, a total offense level of more than 43 shall be treated as if it is 43. Accordingly, the total offense level is 43.

i. Based upon the information now available to the Government (including representations by the defense), the defendant has zero criminal history points and is in Criminal History Category I.

j. Based upon the calculations set forth above, the defendant's Guidelines range is life, with a mandatory minimum term of 120 months' imprisonment At Guidelines level 43, the applicable fine range is $50,000 to $10,000,000.

k. The defendant admits to the forfeiture allegation with respect to Count 1.

**Status of Co-Defendants**

9.    On May 3, 2021, GIOVANNI DE LA MORA (P7177441/T. Farrence) appeared before the Honorable Katharine H. Parker and allocuted to the lesser included offense as charged in Count 1 [Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine] of S1 21 CR 133(VM). On September 10, 2021, DE LA MORA appeared before the Honorable Victor Marrero and was sentenced to 90 months' imprisonment, to be followed by a term of four years' supervised release.

10.   On July 12, 2021, JAIME SANTILLANO (P6461072/R. Flemen) appeared before the Honorable Gabriel W. Gorenstein and allocuted to the lesser included offense charged in Count 1 of S1 21 CR 133(VM), in accordance with a written plea agreement. On February 2, 2023, SANTILLANO appeared before the Honorable Victor Marrero and was sentenced to 86 months' imprisonment, to be followed by four years' supervised release.

11.   Charges remain pending against ROGELIO RAMOS ROMAGUERA (P7238163/Unassigned), TOMMY NEPONUCENO (P7238143/Unassigned), and FRANCISCO JAVIER MECINA BARRERA (P7393771/Unassigned).

**Adjustment to Incarceration**

12.   As corroborated by certificates of completion, the defendant completed two bible study courses offered by the American Bible Academy on February 7, 2023, and March 14, 2023. While remanded at the MDC Brooklyn, the defendant has worked as a unit orderly and has been assigned to clean the showers within his unit.

Cabrera Huato, Adalid                          6                    P7963351 - Flemen, Robert

### The Offense Conduct

13.     The offense summary was prepared after having reviewed Court documents, such as the charging instrument and the Complaint, as well as additional offense details provided by the Government.

14.     The following investigation was conducted by the Drug Enforcement Administration. Law enforcement officers utilized records, reports, and conversations with a confidential source to gather information concerning the below investigation.

15.     Beginning in October 2020, law enforcement officers began investigating a suspected drug trafficking organization ("DTO") based in Mexico, Texas, and elsewhere, which was involved in transporting large amounts of narcotics, including methamphetamine, from Texas to the New York City area.

16.     Law enforcement officers conducted an investigation on the large-scale drug trafficking and smuggling organization that was run by FRANCISCO JAVIER MECINA BARRERA, a/k/a "Angel" (MECINA) and **ADALID CABRERA HUATO a/k/a "China" ("CABRERA")**.

17.     GIOVANNI DE LA MORA was a trusted member of the DTO and is the nephew of FRANCISCO JAVIER MECINA BARRERA. In early 2020, at MECINA and **CABRERA's** direction, DE LA MORA was recruited by MECINA to help him establish the DTO in the United States, which MECINA called the "Cartel de Houston" (Houston Cartel) or "CDH." The purpose of the DTO was to smuggle hundreds of kilograms of crystal methamphetamine from Mexico into Texas, and then to deliver those drugs all over the United States, including to Maryland, Pennsylvania, Kansas, Texas, and New York. The organization used firearms to protect themselves and intimidate others, and obtained additional firearms, which they smuggled into Mexico and delivered to Mexico-based drug traffickers. The organization was operating with the permission of the Sinaloa Cartel, a large-scale violent Mexico-based drug trafficking and smuggling organization.

18.     After joining forces with MECINA, DE LA MORA recruited or assisted in recruiting several other individuals to work for MECINA and CDH, including JAIME SANTILLANO, ROGELIO RAMOS ROMAGUERA, and TOMMY NEPONUCENO.

19.     DE LA MORA first recruited RAMOS ROMAGUERA to join the conspiracy. Then, DE LA MORA and RAMOS ROMAGUERA began crossing the Mexico-Texas border repeatedly in DE LA MORA's car so as to establish an apparent pattern of legitimate border crossings. Thereafter, they were provided with a Sport Utility Vehicle (the SUV) by MECINA, which was outfitted with a hidden compartment or "trap." DE LA MORA and RAMOS ROMAGUERA utilized the SUV to deliver kilograms of crystal methamphetamine to numerous states in the United States, including to Maryland, Kansas, parts of Texas, and New York.

Cabrera Huato, Adalid         7         P7963351 - Flemen, Robert

20. In addition, on multiple occasions, DE LA MORA and RAMOS ROMAGUERA drove the SUV into Mexico to obtain crystal methamphetamines from Mexico-based drug traffickers, and smuggled them back into the United States, where they provided them to Mecina and **CABRERA** at a ranch (the "Ranch") **CABRERA's** family controlled outside of Houston. The organization utilized the Ranch as the base of its operations. After the kilograms of crystal methamphetamine were smuggled by the couriers from Mexico into Houston, MECINA and **CABRERA** met them at the ranch where they removed the drugs from the from the SUV's trap, cleaned them, and then sent them to buyers around the country. Many of these wholesale buyers were customers of **CABRERA's.**

21. DE LA MORA also purchased, and recruited others to purchase, numerous firearms to smuggle into Mexico.

22. In September 2020, law enforcement officers, working with Mexican counterparts, seized several firearms, including AK-47 assault rifles, in Reynosa, Mexico. A tracing analysis indicated several of those firearms, including AK-47s, were purchased by DE LA MORA in Houston, Texas.

23. In September 2020, MECINA, DE LA MORA, and SANTILLANO brought RAMOS ROMAGUERA in DE LA MORA's car to a secluded field in Texas and violently assaulted him after RAMOS ROMAGUERA was not following the orders of CDH to their satisfaction. DE LA MORA filmed part of this beating and sent it via WhatsApp to an individual in Mexico, which law enforcement officers later discovered on DE LA MORA's phone. The Government's investigation revealed that after the incident, RAMOS ROMAGUERA was hospitalized and treated, but released thereafter.

24. In October 2020, MECINA, **CABRERA**, DE LA MORA, RAMOS ROMAGUERA, NEPONUCENO (who was introduced to DE LA MORA by RAMOS ROMAGUERA, and who was recruited to join the conspiracy by them both), and others travelled from Houston to Wichita, Kansas. Conspiracy members possessed numerous firearms, including DE LA MORA's AR-15 assault rifle **CABRERA's** assault rifle, and several handguns, in order to intimidate a bar owner who was a drug customer of the organization into giving the DTO money and drugs. This customer was introduced to the DTO by **CABRERA**. When they got there, the defendants met with the bar owner, and MECINA, **CABRERA,** and DE LA MORA flashed firearms and told the bar owner to give over money and drugs. Through the intimidation, the bar owner turned over a firearm, drugs, and money to MECINA and **CABRERA** and also gave a gun to **CABRERA**.

25. Shortly after the trip to Kansas, at MECINA and **CABRERA's** direction, DE LA MORA purchased handguns at firearms stores in Houston, Texas, and recruited others to purchase additional firearms, to smuggle into Mexico. DE LA MORA, RAMOS ROMAGUERA, and NEPONUCENO drove the SUV, with the guns stored in the car's hidden compartment, into Mexico, where the Mexico-based traffickers received the guns and loaded kilograms of crystal methamphetamine into the SUV, which the three then smuggled back into the United States.

Cabrera Huato, Adalid                    8                    P7963351 - Flemen, Robert

26.    At the Ranch, MECINA and **CABRERA** spoke on the phone with co-conspirators
       (including a contact of **CABRERA** and MECINA's named "Flaco") about sending people
       to deliver narcotics to New York. They then instructed DE LA MORA, RAMOS
       ROMAGUERA and NEPONUCENO to deliver 5 kilograms of methamphetamine to New
       York, as described above.

27.    On behalf of the organization, SANTILLANO and others utilized the SUV that was
       modified with the hidden trap to deliver crystal methamphetamine to the organization's
       customers during numerous trips to several of the United States. SANTILLANO also
       utilized the SUV to travel into Mexico to deliver firearms purchased by other members of
       the conspiracy to Mexico-based drug traffickers.

28.    SANTILLANO frequently assisted MECINA in removing the narcotics that DE LA
       MORA and RAMOS ROMAGUERA had smuggled from Mexico.

29.    In addition, MECINA utilized SANTILLANO to retrieve the vehicle he provided to DE
       LA MORA and RAMOS ROMAGUERA after one of their trips to deliver narcotics to
       Wichita, Kansas.

30.    A few days after they arrived back in the United States from Mexico, the DTO expanded
       their activities and attempted to sell kilograms of methamphetamine in New York. On
       behalf of MECINA, **CABRERA**, DE LA MORA recruited RAMOS ROMAGUERA, and
       NEPONUCENO to travel to New York, where they attempted to sell approximately five
       kilograms of the crystal methamphetamine to a confidential source (CS-1). They went to
       New York to meet a customer of "Flaco's"—a Mexico-based drug trafficker who was an
       associate of **CABRERA's**.

31.    On November 2, 2020, CS-1 exchanged several telephone calls with an individual using a
       Mexico-based phone number and who identified himself as "Flaco," who stated that
       individuals working for him would be arriving in the New York City area later that day to
       engage in a narcotics transaction with CS-1. "Flaco" then put CS-1 in touch with an
       individual, later identified as DE LA MORA, who was using a phone number with a Texas
       area code, and who then engaged in several phone communications with CS-1 about
       engaging in a narcotics transaction at a particular location in the Bronx, New York. CS-1
       drove to the location and later that day DE LA MORA, RAMOS ROMAGUERA, and
       NEPONUCENO arrived in a car together, parked near the location, and exited the vehicle,
       holding a duffel bag.

32.    Upon their arrival, DE LA MORA informed CS-1 that he wished to conduct the narcotics
       transaction that they had previously discussed by phone. CS-1 replied that DE LA MORA
       should enter the vehicle driven by CS-1 so they could engage in the narcotics transaction
       inside the car; however, they replied, that they "had orders from the top to do it inside a
       hotel room" and DE LA MORA did not get into the vehicle driven by CS-1 at that time.

33.    Ultimately, DE LA MORA, RAMOS ROMAGUERA, and NEPONUCENO returned the
       duffel bag back to their vehicle, and, later that night, following a traffic stop and subsequent
       consent-search of that vehicle, law enforcement officers recovered approximately five

Cabrera Huato, Adalid                                    9                                    P7963351 - Flemen, Robert

kilograms of crystal methamphetamine from inside of the vehicle, with most of the narcotics located inside the duffel bag. Upon inspecting the narcotics, officers observed that each bundle had a prominent "F" written on it, which based on the the the Government's investigation, signified that they were for or on behalf of "Flaco."

34. Law enforcement agents field tested the bundles of narcotics, which tested positive for methamphetamine. Later, at a DEA laboratory, the bundles of narcotics were weighed and scientifically tested, and were determined to contain approximately 4,785 grams of pure methamphetamine hydrocholoride, a purity level consistent with narcotics provided by a large-scale DTO.

35. After their arrests, on November 2, 2020, DE LA MORA, RAMOS ROMAGUERA, and NEPONUCENO each waived their respective Miranda rights and informed law enforcement agents, in sum and substance and to varying degrees, that they were paid to travel from Texas to New York with drugs.

36. As the investigation was ongoing, warrants were later issued for the arrests of MECINA and SANTILLANO. MECINA was arrested on April 14, 2021, and SANTILLANO was arrested on April 21, 2021. They were both arrested in the Southern District of Texas.

37. Law enforcement officers subsequently obtained search warrants for DE LA MORA's iPhone and iPad, which he had brought to New York. Those devices showed numerous photos and videos of crystal methamphetamine; large quantities of money, both in U.S. dollars and Mexican Pesos; firearms, including several automatic weapons; and large numbers of handguns. The devices also contained numerous conversations with other members of the conspiracy (including via encrypted messaging applications), about, among other things, purchasing firearms, delivering narcotics, and discussing other members of the conspiracy. For example, on November 2, 2020—in the hours before DE LA MORA, RAMOS ROMAGUERA, and NEPONUCENO were arrested, MECINA and DE LA MORA engaged in numerous communications via Threema (an encrypted messaging application) in which they discussed, in Spanish, the narcotics transaction with CS-1, and MECINA's instructions to DE LA MORA about arranging that transaction, and what to say to Flaco. There were also communications in which MECINA provided DE LA MORA instructions to relay to other members of the conspiracy, including to SANTILLANO.

38. DE LA MORA and SANTILLANO are being held accountable for at least 45 kilograms of methamphetamine and also for possessing firearms during the offense. They were also present for the violent assault of ROMAGUERA in September 2020.

Cabrera Huato, Adalid                    10                    P7963351 - Flemen, Robert

39.    In or around April 2022, agents executed a search warrant of the Ranch where they recovered three firearms (a handgun and two shotguns), large numbers of vehicles, and numerous white buckets which are consistent with storing crystal methamphetamine after it was smuggled into the country. Agents also arrest **CABRERA** and his apartment nearby the Ranch where agents recovered four additional firearms, as well as approximately 3.5 kilograms of crystal methamphetamine. Agents also recovered numerous cellphones.

40.    After executing search warrants on **CABRERA's** devices, agent found evidence that he was involved in a shipment of 800 kilograms of crystal methamphetamine worth $35 million that was seized the same month as **CABRERA's** arrest. The methamphetamine was smuggled in a truck and hidden in large amounts of strawberry puree. The devices included, among other things, an invoice for the shipment of 224 buckets each containing 28 pounds of strawberry puree (over 6,000 pounds in total) as well as images of white buckets (similar to those found at the Ranch) covered in apparent strawberry puree. Agents also found text messages with **CABRERA's** girlfriend about narcotics trafficking with "La Estrella" – the same name as the restaurant that co-conspirators went to in Mexico.

41.    **CABRERA** is responsible for distributing at least 45 kilograms of methamphetamine. During the commission of the instant offense, **CABRERA** maintained a leadership role in the instant offense, possessed multiple firearms, and made a credible threat of violence.

### Victim Impact

42.    As the instant offense is a violation of 21 U.S.C. § 846, there are no identifiable victims in this case and restitution is not an option.

### Adjustment for Obstruction of Justice

43.    The probation officer has no information indicating the defendant impeded or obstructed justice.

### Adjustment for Acceptance of Responsibility

44.    On the advice of defense counsel, the defendant declined to discuss his involvement in the instant offense and elected to rely on his plea allocution.

### Offense Level Computation

45.    The November 1, 2021, Guidelines Manual, incorporating all guideline amendments, was used to determine the defendant's offense level. USSG §1B1.11.

### Count 1: Conspiracy to Distribute and Possess With the Intent to Distribute Methamphetamine

46.    **Base Offense Level:** The guideline for a violation of 21 U.S.C. §846 is USSG §2D1.1. Pursuant to §§2D1.l(a)(5) and 2D1.l (c)(l), the base offense level is 38 because the offense involved at least 45 kilograms or more of methamphetamine.    **38**

Cabrera Huato, Adalid                    11                    P7963351 - Flemen, Robert

47.   **Specific Offense Characteristics:** Pursuant to §2D1.l(b)(l), two levels are added
      because the defendant possessed multiple firearms during the offense.                **+2**

48.   **Specific Offense Characteristics:** Pursuant to §2D1.l (b)(2), two levels are added
      because the defendant made a credible threat to use violence during the October
      2020 meeting with a bar owner in Wichita, Kansas.                                    **+2**

49.   **Specific Offense Characteristics:** Pursuant to §2D1.l (b)(5), two levels are added
      because the offense involved the importation of methamphetamine and the
      defendant is not subject to a mitigating role adjustment under §3B1.2.              **+2**

50.   **Victim Related Adjustment:** None.                                                 **0**

51.   **Adjustment for Role in the Offense:** The defendant was an organizer or leader of
      a criminal activity that involved five or more participants or was otherwise
      extensive; therefore, four levels are added. USSG §3B1.1(a).                        **+4**

52.   **Adjustment for Obstruction of Justice:** None.                                     **0**

53.   **Adjusted Offense Level (Subtotal):**                                              **48**

54.   **Chapter Four Enhancement:** None.                                                  **0**

55.   **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance
      of responsibility for the offense. Accordingly, the offense level is decreased by two
      levels. USSG §3E1.1(a).                                                             **-2**

56.   **Acceptance of Responsibility:** The defendant has assisted authorities in the
      investigation or prosecution of the defendant's own misconduct by timely notifying
      authorities of the intention to enter a plea of guilty. Accordingly, the offense level
      is decreased by one additional level. USSG §3E1.1(b).                               **-1**

57.   **Total Offense Level:** Pursuant to Chapter 5, Part A (comment n.2), in those rare
      instances where the total offense level is calculated in excess of 43, the offense
      level will be treated as a level 43.                                                **43**

Cabrera Huato, Adalid                    12                P7963351 - Flemen, Robert

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudication(s)

58.  None.

### Adult Criminal Conviction(s)

59.  None.

### Criminal History Computation

60.  The criminal convictions above result in a subtotal criminal history score of zero.

61.  The total criminal history score is zero. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of zero establishes a criminal history category of I.

### Other Criminal Conduct

62.  None.

### Pending Charges

63.  None.

### Other Arrests

64.  None.

## PART C. OFFENDER CHARACTERISTICS

### Personal and Family Data

65.  The defendant was interviewed by the undersigned on April 12, 2023, while remanded at the MDC Brooklyn with the assistance of a Court-certified Spanish interpreter.

66.  As verified by ICE, Adalid Cabrera Huato was born on November 27, 1997, in Mexico. He is the son born from the marital union between Cristobal Cabrera, age 53, and Urbana Huato, age 47. The defendant has five biological siblings, who reside in Houston, TX. Epifanio Cabrera Huato, age 30, is presently incarcerated subsequent to a drug-related charge; Selena Cabrera Huato, age 27, works for a medical device company; Carlos Cabrera Huato, age 21, is a construction worker; Christopher Cabrera Huato, age 20, is also a construction worker; and Ariana Cabrera Huato, age 18, is attending college.

67.  The defendant described his childhood as "not very good" because he was raised under lower-income economic circumstances. Cabrera Huato's parents struggled to provide for the family's basic needs. The defendant's father worked as a field hand, and his mother sold baked goods from their home. Food and proper clothing were often in limited supply during Cabrera Huato's childhood. Cabrera Huato's family resided in a small one-bedroom

Cabrera Huato, Adalid                        13                   P7963351 - Flemen, Robert

home, which was shared amongst seven other family members. Cabrera Huato, along with his siblings, slept in the living room of the home. When Cabrera Huato was eight years old, he began working in the fields each day with his father to help financially support his family. Cabrera Huato reportedly worked up to five hours after returning home from school each day.

68.   Cabrera Huato reported several incidents of physical abuse involving his father during his childhood. Cabrera Huato's father abused alcohol and often became violent towards his children. The defendant was beaten with an extension cord by his father on several occasions. Cabrera Huato reported that he enjoyed a close relationship with his mother. He described his mother as a "loving person," and he reported no incidents of abuse or neglect involving his mother.

69.   The defendant reported that he was often witness to drug-trafficking and violence during his childhood. He explained that drug cartels often recruited or forced lower-income families to smuggle drugs for them. Cabrera Huato reported that he saw bodies lying in the street who had been shot by members of the drug cartels.

70.   In 2014, Cabrera Huato illegally entered the U.S. in search of employment opportunities to help financially support his family. The defendant reported that he paid a "coyote" to smuggle him into the U.S. across the border into Texas. Cabrera Huato reportedly walked for five days straight with limited food and water before he was packed into a van and driven into the U.S. According to ICE records, the defendant is not legally in the U.S. and is under removal proceedings.

71.   Cabrera Huato reported that his father was kidnapped by a drug cartel in Mexico in the months leading up to his arrest for the instant offense. The defendant's father was reportedly ambushed while driving nearby his home. Members of a drug cartel allegedly fired several rounds into his father's vehicle and placed him into their vehicle. Cabrera Huato has been held hostage for the past several months. The drug cartel responsible for the kidnapping is reportedly demanding that Cabrera Huato's family pay a $5,000(USD) ransom for his father's release. Cabrera Huato's family were reportedly sent pictures of Cabrera Huato's father, who appeared to be in poor health and had several visible wounds, including a large laceration to his face.

72.   Since 2018, Cabrera Huato has been involved in a consensual relationship with Britany Ortiz, age 22, who works as a receptionist and resides in Houston, TX, with her parents. The defendant and Ms. Ortiz have two children together. Aurora Cabrera Huato, age 4, and Boston Cabrera Huato, age 3, are in good physical health and reside with their mother. The defendant reported that his oldest child has been traumatized by his arrest for the instant offense. Aurora witnessed the defendant being placed under arrest, and she now suffers from anxiety and will scratch her forehead continuously until drawing blood. The defendant's wife is aware of his arrest for the instant offense and has remained emotionally supportive. An interview is pending with the defendant's wife.

Cabrera Huato, Adalid                      14                    P7963351 - Flemen, Robert

73.   Cabrera Huato has always resided in Texas since illegally entering the U.S. At the time of
      his arrest for the instant offense, Cabrera Huato resided in an apartment in Houston, with
      his girlfriend and children. The defendant's girlfriend has since moved out of this
      apartment. Therefore, the defendant is undomiciledand a home inspection can not be
      conducted in this case.

### Physical Condition

74.   The defendant stands 5'6" and weighs approximately 185 pounds. He has brown eyes and
      black hair. Cabrera Huato reported having the following tattoos: his last name on his right;
      arm; his mother's name on his left arm; and his daughter's name on his left shoulder.

75.   Cabrera Huato reported that he is in good health, and he is not taking any medications at
      this time.

### Mental and Emotional Health

76.   Cabrera Huato reported a history of anxiety, dating back to the time of his arrest for the
      instant offense. The defendant reportedly developed an anxiety condition from being
      subject to frequent "lockdowns" while remanded at the MDC Brooklyn. Cabrera Huato
      reported that he is often confined to his cell for several days at a time, with limited access
      to medical care or contact with his family. Cabrera Huato has admittedly contemplated
      suicide on two occasions; however, he denied any recent thoughts of suicide and claimed
      that these two incidents occurred several months ago. Cabrera Huato reported that he is
      now able to cope with his anxiety by praying and attending prayer services.

77.   The defendant impressed as coherent and relevant during the presentence interview and
      responded appropriately to all questions posed during the interview.

### Substance Use Disorder

78.   When Cabrera Huato was 14 years old, he began consuming alcohol with his friends out
      of curiosity. By age 20, the defendant was consuming alcohol to the point of intoxication
      up to four times a week. Cabrera Huato reported that he was depressed and stressed over
      the difficulties he has experienced in his life, and he turned to alcohol to help him cope
      with this issue. In addition to alcohol, Cabrera Huato snorted cocaine at least twice a day
      during this same period.

79.   Cabrera Huato reported that he began to curtail his substance use in the months leading up
      to his arrest for the instant offense. He reported that his girlfriend disapproved of his
      substance use, so he began to limit his alcohol consumption and cocaine use to a few times
      a month. Cabrera Huato has never enrolled in substance use counseling or treatment;
      however, he expressed a willingness to enroll in a treatment program upon his release from
      custody.

Cabrera Huato, Adalid                  15                  P7963351 - Flemen, Robert

### Educational, Vocational and Special Skills

80.  The defendant has completed the U.S. equivalent of high school in his native Mexico. Cabrera Huato has never attended school in the U.S.

81.  Cabrera Huato is fluent in Spanish, and he displayed a limited command of English during the presentence interview.

### Employment Record

82.  At the time of his arrest for the instant offense and dating back to 2021, the defendant worked as an independent construction worker, earning an average between $700 and $750 weekly depending upon the amount of work he was hired to perform.

83.  From 2015 through 2018, Cabrera Huato reportedly worked for a construction company named "Elite Solution Construction Concrete" which is located in Houston, TX. The defendant earned an average of $500 weekly depending on the size of the job he was hired to perform. This employment represents the defendant's only occupation during the time he resided in the U.S.

84.  While residing in Mexico, the defendant performed various odd jobs to financially support himself, including working in the fields.

### Financial Condition: Ability to Pay

85.  In a financial statement provided by the defendant, he reported having no assets. With regard to his liabilities, the defendant reported a $2,000 (USD) personal loan which he obtained from his family.

86.  As the defendant is an illegal alien, who has never been issued a social security number, we were unable to conduct an Equifax credit check.

87.  Based on the above information, we do not believe that the defendant does not have the ability to pay a fine in this case.

## PART D. SENTENCING OPTIONS

### Custody

88.  **Statutory Provisions:**  The minimum term of imprisonment is 10 years and the maximum term is life. 21 U.S.C. §846 and 21 U.S.C. §841(b)(1)(A).

89.  **Guideline Provisions:** Based upon a total offense level of 43 and a criminal history category of I the guideline imprisonment range is life.

### Impact of Plea Agreement

90.  None.

Cabrera Huato, Adalid                      16                      P7963351 - Flemen, Robert

### Supervised Release

91. **Statutory Provisions:** The Court must impose a term of supervised release of at least five years. 21 U.S.C. § 841(b)(1)(A).

92. **Guideline Provisions:** The guideline term of supervised release is five years. USSG §5D1.2(c).

### Probation

93. **Statutory Provisions:** The defendant is ineligible for probation because it is expressly precluded by statute. 21 U.S.C. §841(b)(1)(A).

94. **Guideline Provisions:** The defendant is ineligible for probation because probation has been expressly precluded by statute. USSG §5B1.1(b)(2).

### Fines

95. **Statutory Provisions:** The maximum fine is $10,000,000. 21 U.S.C. § 841(b)(1)(A).

96. A special assessment of $100 is mandatory. 18 U.S.C. § 3013.

97. **Guideline Provisions:** The fine range for this offense is $50,000 to $10,000,000. If the defendant is convicted under a statute authorizing (A) a maximum fine greater than $500,000, or (B) a fine for each day of violation, the Court may impose a fine up to the maximum authorized by the statute. USSG §§5E1.2(c)(3) and (c)(4).

98. Costs of prosecution shall be imposed on the defendant as required by statute. USSG §5E1.5. In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed. USSG §5E1.2(d)(7) and 18 U.S.C. § 3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the United States Courts, dated August 27, 2021, provides the following monthly cost data:

|  | **Bureau of Prisons Facilities** | **Community Correction Centers** | **Supervision by Probation Officer** |
|---|---|---|---|
| Daily | $121.00 | $98.00 | $12.00 |
| Monthly | $3,688.00 | $2,980.00 | $371.00 |
| Annually | $44,258.00 | $35,761.00 | $4,454.00 |

Cabrera Huato, Adalid                     17                  P7963351 - Flemen, Robert

## PART E. FACTORS THAT MAY WARRANT DEPARTURE

99.    The probation officer has not identified any factors that would warrant a departure from
       the applicable sentencing guideline range.

## PART F. FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM

100.   The probation officer has no information concerning the offense or the offender that would
       constitute additional factors which would warrant a sentence outside of the advisory
       Guidelines range.

Respectfully Submitted,

Joshua Sparks
Chief U.S. Probation Officer

_Thomas J. McCarthy (for)_

By:    Robert  Flemen
       USPO

Approved:

_Thomas J. McCarthy_

Thomas J. McCarthy
SUSPO

Cabrera Huato, Adalid                    18                    P7963351 - Flemen, Robert

# APPENDIX A

# (Judiciary Sentencing Information)

Cabrera Huato, Adalid                          19                    P7963351 - Flemen, Robert

**Judiciary Sentencing Information (JSIN)**

The following information is from the U.S. Sentencing Commission's JSIN database
(https://www.ussc.gov/guidelines/judiciary-sentencing-information):

During the last five fiscal years (FY2017-2021), there were 32 defendants whose primary
guideline was §2D1.1 and Methamphetamine (actual)/"Ice" was the primary drug type, with a
Final Offense Level of 43 and a Criminal History Category of I, after excluding defendants who
received a §5K1.1 substantial assistance departure. For the 32 defendants (100%) who received a
sentence of imprisonment in whole or in part, the average length of imprisonment imposed was
288 month(s) and the median length of imprisonment imposed was 269 month(s).

The sentencing data provided does not reflect the Commission's recommendation regarding the
appropriate sentence to be imposed or represent the Commission's official position on any issue
or case. Nor does the information provided reflect the Commission's position regarding the
weight to be given, if any, to the above sentencing information in a court's determination of the
appropriate sentence to be imposed.

If the court does consider the above sentencing information as part of its consideration of the
factors in 18 U.S.C. § 3553(a) in imposing sentence, it should do so only after considering the
properly calculated guideline range and any applicable departures provided for in the Guidelines
Manual.

Cabrera Huato, Adalid                    20                    P7963351 - Flemen, Robert

**Sentence Imposed Relative to the Guideline Range for Defendants in Selected Cell**
Fiscal Year 2017-2021
■ Within Range   ■ Downward Departure or Variance   ■ Upward Departure or Variance   ▪ §5K1.1 Substantial Assistance



**Note:** The figure includes the 46 defendants reported to the Commission whose primary guideline was §2D1.1 and Methamphetamine (actual)/"Ice" was the primary drug type, with a Final Offense Level of 43 and a Criminal History Category of I, including defendants who received a §5K1.1 substantial assistance departure. Cases missing information necessary to complete the analysis were excluded from this figure. Defendants who received a §5K1.1 substantial assistance departure are included in this analysis but are excluded from other analyses below. As such, the number of defendants included in this analysis may exceed the number of defendants in other analyses. Total percentages displayed in the figure may not sum to 100% due to rounding.

**Sentence Type for Defendants in Selected Cell (after excluding §5K1.1)**
Fiscal Year 2017-2021
■ Defendants Receiving Imprisonment (In Whole or In Part)   ▪ Defendants Receiving Probation or Fine Only



**Note:** The figure includes the 32 defendants reported to the Commission whose primary guideline was §2D1.1 and Methamphetamine (actual)/"Ice" was the primary drug type, with a Final Offense Level of 43 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. Cases missing information necessary to complete the analysis were excluded from this figure. Total percentages displayed in the figure may not sum to 100% due to rounding.

The *Defendants Receiving Imprisonment* category includes defendants sentenced to a term of imprisonment (in whole or in part) and who received a commitment to the Bureau of Prisons. This category includes (1) defendants sentenced to a term of imprisonment only, with no additional conditions of community confinement, home detention or intermittent confinement (Prison Only) and (2) defendants sentenced to imprisonment and conditions of alternative confinement as defined in USSG §5C1.1 (Prison and Alternatives). This category includes, but is not limited to, Zone A, Zone B, or Zone C cases receiving prison with additional conditions of a term of community confinement, home detention, or intermittent confinement.

The *Defendants Receiving Probation* category includes defendants sentenced to a term of probation with or without a condition of community confinement, intermittent confinement, or home detention (Probation Only and Probation and Alternatives). This category also includes defendants who received no prison, no probation, and no time of alternative confinement as defined in USSG §5C1.1, but instead who received a fine and/or a special assessment (Fine Only).

**Average and Median Length of Imprisonment for Defendants in Selected Cell Who Received a Sentence of Imprisonment (excluding §5K1.1)**
Fiscal Year 2017-2021
■ Average Length of Imprisonment   ▪ Median Length of Imprisonment



**Note:** The figure includes the 32 defendants reported to the Commission (1) whose primary guideline was §2D1.1 and Methamphetamine (actual)/"Ice" was the primary drug type, with a Final Offense Level of 43 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure; and (2) the defendant received a sentence of imprisonment in whole or in part. Cases missing information necessary to complete the analysis were excluded from this figure.

*Average and Median Length of Imprisonment* reports the average and median term of imprisonment imposed in months for cases in which a term of imprisonment was imposed. Probation sentences are excluded. Any portion of a sentence that is an alternative confinement as described in USSG §5C1.1 is also excluded. Cases in which a sentence is imposed, but where the length is indeterminable, are excluded. When sentences are expressed as "time served" on the J&C, Commission staff uses the dates in federal custody to determine the length of time served when an defendant has been in custody the entire time. If the defendant has been in and out of custody, or the start date is unclear/missing, then the Commission assigns a value of one day as a minimal time served amount for these cases. In cases where the court imposes a sentence of life imprisonment, sentences are reported as 470 months, a length consistent with the average life expectancy of federal criminal defendants given the average age of federal defendants. Sentences of greater than 470 months are also reported as 470 months.